VAN WINKLE v. THE AMERICAN STEAM BOILER
COMPANY.

1. The defendant having insured a steam boiler, which was in a building
   adjacent to the mill of the plaintiff, and which mill had been injured by
   the bursting of such boiler; and it appearing that the defendant had
   co-operated actively with the owner of the boiler in its management
   —*Held*, that the defendant was responsible for such damage, if the same
   was occasioned by its want of care and skill in such transaction.
2. In such instances, the owner of the dangerous machine is liable for the
   immediate and obvious damage caused by its mismanagement, and all
   persons, whether servants or volunteers, who participate in such mis-
   management, are also liable.
3. There is a public duty to exercise great care and skill incumbent on
   those having charge of instruments which, if mismanaged, are highly
   dangerous to the lives and persons of men who happen to be in their
   neighborhood; and for the non-performance of such duty a person
   specially injured thereby is entitled to sue.

On demurrer to the declaration.   The facts appear fully in
the opinion.

Argued at November Term, 1889, before BEASLEY, CHIEF
JUSTICE, and Justices DEPUE and SCUDDER.

For the plaintiff, *Eugene Stevenson.*

For the defendant, *William Brinkerhoff.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE.   This case stands before the
court on a demurrer to the declaration.

The facts constituting a summary of the plaintiff's cause
of action, as presented in this pleading, are these:   That
he is the owner of a certain mill in Paterson, near to which
is a mill owned by the Ivanhoe Paper Company, in which
there was a large steam boiler, which was so situated that
if it exploded the building of the plaintiff would be inevitably

damaged. That the defendant, the American Steam Boiler Insurance Company, "represented and stated" to the Ivanhoe Paper Company, that it kept in its employ skilled engineers who were expert in the examination and testing of steam boilers, and that in case the paper company insured in the company of the defendant it would have said boiler examined and tested from time to time, and would report the results of such tests and examinations; and that, thereupon, the Ivanhoe Paper Company took a policy from the defendant, against certain specified damages that should be occasioned by the explosion or rupture of said steam boiler.

But it is not perceived how the declarations and representations just expressed can affect the questions to be decided, for certainly, they have nothing to do in the constitution of the conventional *status* of the defendant and the Ivanhoe Paper Mill Company. These statements were all made antecedently to the contract for insurance, which was in writing; they are inconsistent with its provisions, and, consequently, were annulled by its execution.

A copy of the policy of insurance here referred to was annexed to the declaration and is made part of it, in accordance with the Practice act. On reference to it, it appears that so far from the defendant having undertaken the obligation of making the examinations and tests described in the before mentioned representations, there is simply a stipulation to the effect that it should have the right to make inspections if it pleased so to do. The principal clause touching this subject is as follows, viz.:

"Prevention of accidents by explosion being the primary object of this company, it is hereby agreed that the inspector of this company shall, at all reasonable times, have access to said boiler or boilers, and the machinery connected therewith, and every and all facilities be offered to said inspector, when this company shall so desire, for the purpose of making an examination of said boiler or boilers or machinery, and should such inspector, upon said examination, discover any defect affecting the safety of said boiler or boilers or machinery, he

shall notify the assured ; or should the assured discover any defect, or be notified by any person having any interest therein of any defect or source of danger to said boiler or boilers or machinery, and upon such defect being brought to the knowledge of the assured, or of his agent, the said boiler or boilers or machinery so affected shall cease to be worked until such defect shall be corrected or repaired by the assured to the entire satisfaction and approval of the inspector of this company, and upon a failure so to do, this policy shall become null and void."

There is, likewise, a stipulation that in case of the cancellation of the policy the company might retain thirty per cent. of the premium "for the charges of inspection," and another to the effect, in its own language, that the policy should be void "if the load on the safety valve shall be exceeded as approved by the inspector of this company, according to the inspector's certificate, issued to the assured after each inspection."

It is plain, from these references to this policy, that the defendant was in no wise obligated by its contract to make any inspection whatever of this piece of machinery ; it acquired the right to do so by its inspector when it should so desire, but there was nothing in the agreement compelling it to perform such office, and, consequently, if the insurance company had altogether refrained from making an inspection of this boiler, or had refused so to do, it would seem clear that it would have incurred no responsibility, either to the assured or to the plaintiff, for the disaster that has occurred. In such a situation, it would have owed to the former no duty by force of contract, and to the latter none by force of the law.

But this is not the posture of affairs existing at the time of this accident. The declaration avers, and the fact, of course, is admitted by the demurrer, that the defendant, in the exercise of its volition, made repeated inspections of the boiler in question, and furnished the required certificates for the guidance of the engineer of the assured. No one can doubt that, by such a course of action, a duty in favor of the assured was

imposed on the defendant, by the operation of the contract itself, to act with ordinary skill and care, both with respect to its inspection and its certificate. It is deemed that there is no room for doubt that for the proximate damage occasioned by the absence of such care and skill the defendant became answerable to the assured *per contractum;* it had stipulated for such care and skill by the terms of its contract, read in the light of legal rules.

But this is not the aspect of the transaction now presented for scrutiny. It is obvious that the plaintiff cannot rest his right to sue on the contract existing between the defendant and the Ivanhoe Paper Mill Company. To that engagement he is an absolute stranger, and there is no stipulation in it that was designed for his particular benefit. Indeed, it is not perceived that this policy of insurance has any effect in this case, except inasmuch as it may explain and characterize the conduct of the defendant with respect to this steam boiler. Its connection with it, as it is exhibited in the record before the court, forms the pith of the present inquiry. This is plain upon the surface of things.

The boiler, unless properly handled, was a dangerous thing, and, according to the legal rule established by the English courts, the proprietor of such an instrument is deemed an indemnifier for all losses, sufficiently proximate, occasioned by its use. This doctrine is thus stated by Mr. Horace Smith, in his scientific treatise on the Law of Negligence (page 7). After adverting to the contract which the law raises between the common carrier and those who entrust their goods to him in the way of his business, this author proceeds: " With regard to such contracts, express or implied, no question of negligence arises, and the same holds with respect to cases which may be said to be in the nature of assurance, viz., where a person brings upon his land some dangerous thing, such as fire or water, or a dangerous animal, for he is bound, as we shall see, to keep it at home at his peril. In all these classes of cases something more than ' care,' however diligent, is demanded, viz., absolute indemnity." The Amer-

ican decisions maintain a less stringent doctrine. Where the dangerous thing is not in its nature and under the circumstances a nuisance *per se*, the maintainer of it is not, in any sense, an insurer against the loss that it may accidentally cause; he is responsible only for negligence or want of skill in its management or use. Nevertheless, as the thing employed is threatful of peril to others, and as he is using such thing for his private benefit, it has been properly established that the proprietor must exercise a high degree of care, and that if he omits to do so he will be answerable for the ill consequences to others that are the natural and proximate result of such default. Lord Fitzgerald, referring to an operation that the defendant in the case had been engaged in, and which was of a dangerous tendency, thus defines the legal rule : " The law does declare that under such a state of circumstances it was the duty of the defendant to have used every reasonable precaution that care and skill might suggest in the execution of his works so as to protect his neighbor from injury, and that he cannot get rid of the responsibility thus cast on him by transferring that duty to another. He is not in the actual position of being responsible for injury no matter how occasioned, but he must be vigilant and careful, for he is liable for injuries to his neighbor caused by any want of prudence or precaution, even though it may be *culpa levissima.*" *Bower* v. *Peate*, 1 *Q. B. Div.* 321.

This is the legal principle copiously illustrated by citations in the text-books. 2 *Shearm. & R. Neg.*, § 689.

There can be doubt, in view of this legal rule, that for the present accident the Ivanhoe Paper Mill Company, on the assumption of the truth of the facts laid in this declaration, would have been responsible to the plaintiff for the damage done to his property. The boiler was a highly dangerous machine when in use; it was the plain duty of the company to have it inspected at proper periods. And the case shows that if that had been done the calamity would have been avoided; that, in this state of affairs, an action would have lain against the Ivanhoe company is indisputable.

And this responsibility is the effect of the obligation that arose *de jure*, out of the situation, being comprehended in the maxim *sic utere ut alienum non lœdas*. Having this boiler in use, conditioned as described, the paper company could not by any device free itself from the duty of operating it with the utmost care and skill, nor from the liability to idemnify those who should be injured, in a legal sense, by the omission of such care and skill. To this extent the legal status is clear. The question is, Whether the duty thus defined became incumbent on the defendant to such a degree as to place upon it a responsibility of a similar kind, for the damage now in question.

It does not appear to be doubtful, from the statements in the declaration, that it was an essential part of the duty of the paper company, in the safe and skillful management of this boiler, to have it examined and tested from time to time, by a person of requisite knowledge. It was this necessary function that the defendant entered upon the execution of. As has been stated, the insurance company was not compelled, by force of its contract, to the performance of this supervision, but it is undeniable that as it proceeded to do so, it thereby became bound by the express terms of its contract to disclose to the assured "any defect affecting the safety of said boiler," and to issue a certificate defining the load that could be put on the safety valve. By the course thus taken it is not at all difficult to mark out the reciprocal rights and obligations of the parties to this policy, *inter se;* but such exposition is, at present, comparatively of little account, as the inquiry is not with respect to the force of this contract, but altogether as to the legal effect of the acts done under it by the defendant, so far as they affect the rights of the plaintiff, who is a stranger to it.

What the defendant did was this : It co-operated with the owner of this dangerous instrument in its management, in a particular indispensable to its safe use, and it thereby, in that degree, constituted itself the agent, or the substitute, of such owner. It performed a series of acts that could not be per-

formed by the owner without the responsibility just mentioned; and as such responsibility belonged not to the ownership of the machine, but to the function of operating it, it does not seem that any one could perform such function without incurring the responsibility. Very plainly the defendant stood within the spirit of the rule that laid upon the proprietor of the boiler the duty of exercising care and skill in its use. That rule is but the creature of social justice. That a man cannot do an act for his own benefit or pleasure, the natural consequence of which will be detrimental to the equal rights of another, is an equitable principle of importance to the common welfare; and the rule that one man cannot with impunity assist another in doing such wrongful act, appears to be a necessary corrollary to the proposition, unless such proposition is to be regarded as purely formal and arbitrary. In the present instance, this boiler burst and injured the adjacent property of the plaintiff solely, as the facts now appear, by reason of the omission of a proper test and inspection; the defendant, by its inspector, was in the actual performance of that function, and it was its agent that was morally and primarily at fault; it would seem, therefore, quite unreasonable to say that the defendant, whose servant the inspector was, is not liable; but that the Ivanhoe Paper Mill Company, whose servant the inspector was not, is liable. The plaintiff was the owner of the adjacent property, near to the place of this boiler; the machine, unless carefully operated, was dangerous to everything in its immediate neighborhood; no one could open his eyes and not see this situation, for, in this respect, *res ipsa loquitur;* plainly, therefore, the owner of the machine, even according to the limited rule adopted by the courts of this country, was answerable to the plaintiff for the results of the careless management of such machine; and so, for a like reason, as we think, must every person be similarly responsible who participates in a substantial degree in such management, whether he be a contractor with the owner, or his servant, or even if he be a mere volunteer. The situation itself creates the duty to exercise care and skill in a high degree in every one who meddles in a matter

fraught with such peril to the property of another. The defendant, the insurance company, as soon as it took part, practically, in the management of this machine, became subject to a duty in that particular by virtue of its contract with the Ivanhoe Paper Mill Company to conduct itself with care and skill, and by virtue of the law, to a similar duty towards the plaintiff; and it is the violation of this latter duty which, we think, forms a legal foundation for this action.

And it would seem that there is a broader ground than the one above defined on which the present case can be based. It is this, that in all cases in which any person undertakes the performance of an act which, if not done with care and skill, will be highly dangerous to the persons or lives of one or more persons, known or unknown, the law, *ipso facto*, imposes as a public duty the obligation to exercise such care and skill. The law hedges round the lives and persons of men with much more care than it employs when guarding their property, so that, in this particular, it makes, in a way, every one his brother's keeper, and, therefore, it may well be doubted, whether in any supposable case redress should be withheld from an innocent person who has sustained immediate damage by the neglect of another in doing an act which, if carelessly done, threatens, in a high degree, one or more persons with death or great bodily harm. Such misfeasances, if they result fatally, are indictable crimes. Where they inflict particular damage upon individuals they should, it is conceived, be actionable. There are many decisions that appear to rest on this basis. A typical case is that of *Thomas* v. *Winchester*, 6 *N. Y.* 397. The facts were, that a druggist had carelessly labeled a deadly poison as a harmless medicine, and who had sold it to another druggist, from whom the plaintiff had obtained it. The health of the plaintiff had been injured by taking some of the poison, having been misled by the deceptive label. The action was sustained, founded on these facts. It is obvious that this case is embraced within the terms of the proposition just posited. If the plaintiff had died by reason of the taking of the poison, the original vendor would have

been indictable.  He was guilty, therefore, of a breach of a public duty, and, inasmuch as the plaintiff had sustained a special injury by such wrong, her right of suit was vindicated. Similarly, the principle is exemplified in *Parry* v. *Smith, L. R.,* 4 *C. P. Div.* 325.  A gasfitter, in repairing a gas meter, supplied a temporary pipe; the plaintiff, a servant, in the course of his employment, lighted the gas, and was injured by the negligence of the gasfitter.  The plaintiff recovered on the ground that his right of action was founded on the duty that was deemed to attach in every case where " a highly dangerous thing which, unless managed with the greatest care, is calculated to cause injury to by-standers."  In that case it was said, that the negligence in question was misfeasance, independent of contract.

For many cases of this strain, reference may be made to the following text-books:  *Smith Law Neg.* 94 *et seq.; Whart. Neg.,* § 853 *et seq.*

It is conceived that the well known case of *Heaven* v. *Pender,* 11 *Q. B. Div.* 503, falls properly within this category. This was the affair to be adjudicated:  A dock owner, in hiring his dock, supplied, under a contract with the ship owner, a painter's stage, to be slung in the ordinary way, outside of the ship, in the process of painting her.  The plaintiff, a man in the employ of the master painter, was hurt in using the sling, owing to its imperfect condition.  The suit was against the owner of the dock by the employe thus injured, and consequently there was not the least conventional relation between these parties to the action.  There was no duty, arising from contract, incumbent on the defendant in favor of the plaintiff; but it would seem that there was a duty due from the former to the public by force of the transaction.  The stage in question appears to belong to the class of instruments dangerous, if out of order, in a very high degree, to the bodies, and even lives, of those who might use them ; and hence, as the stage in question was greatly out of order, it was manifest that the defendant had been grossly negligent; he had failed

to discharge the duty imposed on him by law to exercise the greatest care when the personal safety of others was dependent on his conduct. This would seem to have been the necessary element in the case leading to the result attained, for it is not to be supposed that if the stage had been provided, not as a standing place for the workmen, but as a place of deposit for their tools and paint, and the injury, by the giving way of the stage, had been confined to damage done such articles alone, it would have been held that the action had been well brought. On the theory of a breach of duty as just indicated, the case is not to be distinguished, in respect to the application of legal rules, from the case already cited from 4 *C. P. Div.*

There is a line of cases which, at first sight, may seem adverse to the classification here suggested. As examples of this kind, the cases of *Winterbottom* v. *Wright,* 10 *Mees. & W.* 109, and *Colles* v. *Selden, L. R.,* 3 *C. P. Div.* 495, may be cited. But these cases are variant in point of fact only, and not in point of principle. The carelessness that was sought, in decisions of this class, to be made actionable, was not deemed by the court to be so highly dangerous to the lives or bodies of men as to have put upon those guilty of such carelessness any public duty whatever. For instance, in the latter of the two cases just cited, the ground of action stated in the declaration that was demurred to was, in brief, that the defendant had so carelessly put up a chandelier in a public house that it fell upon and hurt the plaintiff; and the court said "that the declaration should have shown that it was a thing dangerous in itself and likely to do damage, or that it was so hung as to be dangerous to persons frequenting the house." There is no reason to doubt, from the tone of the judicial discussion in the case, that the action would have been deemed to be sustainable if it had been shown that the chandelier in question had been suspended in the centre of a theatre, or other place of public resort, so that if it fell it would have been almost certain to kill or wound a number of persons.

For the non-performance of a public duty of this kind,. which causes a particular damage to the person or property of another, such result being sufficiently proximate to its cause, and being its obvious product, we think an action will lie.

The demurrer must be overruled.