[No. 27514.  *En Banc.*  April 11, 1940.]

BERNARD L. SHERIDAN, *Respondent,* v. AETNA
CASUALTY & SURETY COMPANY, *Appellant.*[1]

[1]Reported in 100 P. (2d) 1024.

424

J. *Speed Smith* and *Henry Elliott, Jr.,* for appellant.

*John F. Walthew* and *James W. Mifflin,* for respondent.

GERAGHTY, J.—The plaintiff suffered severe injuries by a fall into a freight elevator shaft in the Stirrat building, on Second avenue, in the city of Seattle, and instituted action against the owners of the building, James R. Stirrat and wife, Catherine J., for recovery of resulting damages. James R. Stirrat died after institution of the action, and the plaintiff filed an amended complaint, naming as additional defendants the Moline Elevator Company, under contract with the owners of the building for servicing the elevator, and the Aetna Casualty and Surety Company, which carried a liability policy on the elevator at the time of the accident.

The case was tried to a jury, and, at the close of plaintiff's case, the defendants severally interposed challenges to the sufficiency of the evidence. The challenge of Catherine Stirrat was sustained, and she was dismissed from the action. The cause having proceeded to trial against the remaining defendants, the jury's verdict was in favor of the Moline Elevator Company and against the defendant Aetna Casualty and Surety Company. Motions for judgment notwithstanding the verdict or, in the alternative, for a new trial, made by the defendant Aetna Casualty and Surety Company, having been overruled, judgment was entered on the verdict; and the casualty company appeals.

The respondent was employed by Bart Gagnon, transacting business as Gagnon Displays, Inc., in a shop on the fourth floor of the Stirrat building. A passenger elevator, maintained at the front of the building for the use of the tenants, ceased operations at six o'clock p. m. A freight elevator, maintained at the rear of the building, was used by tenants for carrying materials and supplies to and from its several floors. Access to this elevator was had from an alley at the rear of the building, through a double door, parted horizon-

tally. The manner of operating the doors is described by one of appellant's inspectors as follows:

"They are opened by hand and closed by gravity; they automatically close themselves. The top door is a little heavier than the lower one. They are so counter-balanced so when they are released they automatically close and come together. They pull the doors down and there is a catch on the door itself, and this cam (an extension about eight inches long on the bottom of the car) will hold the door open when the car is at the landing. Immediately when the car leaves the landing about four inches that releases this catch, and the doors automatically close. The gates were properly counter-balanced on the various times I inspected that elevator up to August, 1936. If they were overweighted, they would come together with a slam and would be liable to hurt somebody. I did find them when they did not close properly; they had been jammed or got out of line. When they get out of line a little bit they would bind in the guide. The guides are on the sides in which they slide up and down. If the gate was bent out of line it would bind on one or maybe both sides. When I found that condition within possibly a few minutes I got in touch with the building owner or some one in authority and reported to them. I couldn't say if I examined these elevators in August shortly before the accident. I inspected them every three months."

No operator was maintained on the elevator, its movement being controlled by means of a cable operated by hand.

At about six o'clock, on the afternoon of August 19, 1936, the respondent and his employer, Gagnon, left the Stirrat building by the freight elevator, intending to have supper at a near-by restaurant and thereafter return to the shop on the fourth floor. They left the elevator at the alley level, the doors being open, and drove to the restaurant in Gagnon's car. The respondent finished his meal about twenty minutes after six and left to drive his employer's car to the alley.

He parked his car, facing north, on the east side of the alley, opposite the building and somewhat north of the elevator entrance, then walked across the alley and south to the entrance, turned to the right, and stepped into the shaft, falling some twenty-five feet and sustaining the injuries for which he seeks to recover damages. The elevator cage was then at an upper floor, the reasonable inference, of course, being that it had been moved upward during his absence, and that the automatic closing device failed to function.

The day was clear, and the sun did not set until 7:16 p. m., according to Government meteorological reports. The respondent testified:

"I parked the car and crossed over and down the alley, and turned into the elevator entrance, and looked, and I thought I saw the elevator there, and stepped on and it wasn't the elevator. . . . Q. Did you observe what position the doors were in? A. The doors were open. Q. Partly open or wide open? A. No, sir; they were wide open. Q. What else did you see—can you tell us what else you saw as you came up to the elevator? In other words, tell us the picture as it looked to you at that time. A. I couldn't give you any particular point that I saw in there, except the picture as a whole registered with me it was—that the elevator was there."

On cross-examination, he testified that he could not name any particular thing he saw in the shaft that led him to believe the elevator platform was there; that the "picture as a whole" made it appear to him that it was.

"I don't know that I particularly saw the cables. Q. Did you see anything in the shaft that indicated to you—any one thing that indicated to you—that platform was there? A. No one particular object. . . . Q. Now this was broad daylight when you returned to the elevator, wasn't it? A. It was daylight, yes, sir.

. . . Q. Well, did you look to see if the elevator platform was there? A. Yes, I looked, and I had the impression it was there. Q. You didn't give it a very good look, did you? A. I didn't stop to examine it, no. Q. When you walk up to an elevator do you not look to see what you are going to step on before you step into an elevator shaft—do you not do that any time you get into any elevator? A. Not if the doors are open and the elevator appears to be there I don't bother to look at the floor—I step on. Q. A freight elevator where you know there is no operator, you do that? A. Yes."

Gagnon, who left the restaurant some ten minutes after the respondent, testified, on cross-examination, that it was daylight when he returned to the alley entrance, around 6:30. He believed the sun was down, but was not sure. It was a bright day. When he walked up to the elevator shaft, he had no trouble in seeing that the elevator doors were open and the elevator platform was not at the alley level. "I approached the door at almost right angles to it. When I walked up to the elevator door I was almost opposite to it when I started to go to the elevator." There was no artificial light in the shaft. The cage carried an electric light at the top, and there is some conflict in the evidence as to its sufficiency. At any rate, as the cage was above the alley level, it could not have lighted the shaft below.

Respondent testified that the elevator cage had the shape of an open-ended basket, with a platform in between, the sides being protected by a wire grill or netting. On approaching the elevator shaft at the alley level, when the doors were open, one would see the same blank wall at the rear whether the elevator was at that level or not. There was evidence tending to prove that the alley doors were of such construction that they were insufficient for their intended uses, and

that, during a considerable period preceding the accident, they had frequently failed to close automatically as the elevator was moved from the alley level.

The errors assigned by the appellant for reversal of the judgment are grouped under two heads: First, those involving the sufficiency of the evidence to sustain the judgment; and, secondly, those based upon the improper reception of evidence and the giving of faulty instructions. Under the first group of assignments, the appellant contends: (a) That the respondent has no rights under the liability policy; (b) that appellant is not liable by reason of its inspection of the elevator in the Stirrat building, pursuant to the terms of its liability policy; (c) that the city ordinance providing for the inspection of elevators and reports thereof to the city building department furnishes no basis for recovery against the appellant; (d) the absence of causal connection between appellant's inspections and respondent's injuries; and (e) that the respondent was guilty of contributory negligence.

The primary liability for injuries sustained by reason of the condition of the elevator, by anyone rightfully using it without being himself in fault, rested upon the owners of the building. It was owned by Stirrat and wife as community property, its active management being in charge of the husband, who died before the trial. The wife was dismissed from the action for the reason she had taken no part in the management of the building, and that an action for the tortious default of the husband would not survive as against the wife and the community property. As the respondent did not appeal from the dismissal of Mrs. Stirrat, the question of her liability is not involved here.

The appellant, by the terms of its policy, agreed to insure the owners against loss or expense resulting from claims upon them for damages on account of

bodily injuries or death alleged to have been accidentally suffered by any person not employed by them. The policy provided that the bankruptcy or insolvency of the assured should not relieve the company of any of its obligations thereunder, but that, if any person, or his legal representatives, should obtain a final judgment against the assured because of any such injuries, and execution thereon be returned unsatisfied by reason of bankruptcy, insolvency, or any other cause, or if such judgment be not satisfied within thirty days after its rendition, then such person, or his legal representatives, might proceed against the company to recover the amount of such judgment, either at law or in equity, but not exceeding the limit of the policy.

That the respondent is not entitled to sue the appellant upon its policy, in the absence of a judgment in his favor against the assured, is admitted by him. The ground on which he predicates the liability of the appellant is thus stated in his brief:

"The real question is what legal liability rests upon the appellant by reason of having assumed on behalf of the owner to discharge the statutory, and indeed, as we shall hereafter show, the common law liability of inspecting and reporting on the condition of the elevator, not within the terms of its contract, but under and pursuant to the terms of a city ordinance."

The policy provides:

"VI. The Company will inspect the elevators covered hereby whenever it deems necessary and will thereupon suggest to the Assured such changes or improvements as may operate to reduce the frequency and severity of injuries but the Company shall not be liable for failure to make any such inspection or suggestion. Such inspection shall be permitted at any reasonable time. Any authorized representative of the Company may suspend this insurance insofar as it applies to any elevator until any defects or dangerous conditions found are remedied to the satisfaction of the Company.

Notice of such suspension and the reason therefor and of the reinstatement of this insurance must be in writing. For the period of such suspension the Company will allow a pro rata return premium."

The evidence shows that the appellant made quarterly inspections of the elevator for the period of a year and a half, at least, preceding the accident resulting in respondent's injuries. The last inspection before the accident was made August 12, 1936. August 14th, the appellant's chief inspector addressed the following letter to James R. Stirrat:

"James R. Stirrat, et al
"Seaboard Building
"Seattle, Washington
"Gentlemen:

"In connection with the inspection which was recently made of your elevator, we desire to advise you that so far as our inspector was able to determine, there were no conditions present that would cause him to make recommendations for improvements or repairs thereon at this time.                         Yours truly,
                                              "Chief Inspector."

"ELEVATOR INSPECTION.

| "Policy | Assured's Name | Street Location | City or Town | Kind of Elevator |
|---|---|---|---|---|
| "49 H 50 | James R. Stirrat, et al. | N. E. Corner 2nd Ave. & Union St. | Seattle | { 1 Passenger { 1 Freight" |

Letters of like tenor were addressed to the owners after each of the prior inspections and copies sent to the building department of the city of Seattle. The chief inspector, called by the respondent, testified:

"When inspection was made by one of our inspectors and something is found out of order on the elevator, we would notify the owner in writing; and would tell him to have it fixed and advise us. When we received word from him it had been fixed, we then made out a report to him, referring to our inspection, in which we used this form. The form in this case was addressed to James R. Stirrat, owner of this building. We sent to the City of Seattle a copy of that form; *the city ordi-*

*nance requires the owner to make a report to the city, and we made that report for the owner as a matter of service under the policy; there was no provision in the policy that required it."* (Italics ours.)

Ordinance No. 44903 of the city of Seattle, in effect at the time of the accident, made it unlawful for the owner of any freight or passenger elevator to maintain or operate the same unless all equipment and apparatus used or required in connection therewith were regularly inspected as in the ordinance provided. Section 2 of the ordinance provided for inspection and report as follows:

"It shall be unlawful for the owner of any freight or passenger elevator to maintain or operate the same unless such elevator is inspected on or before the first day of January of each and every year, and quarterly thereafter, by a competent inspector, who may be a regularly authorized inspector of a liability insurance company in good standing in the State of Washington, or any employe or representative of some responsible firm in the business of elevator construction and maintenance satisfactory to the superintendent of buildings of the City of Seattle."

Section 3 provides:

"Immediately after any inspection has been made, as required by this ordinance, the owner, manager or agent of the building in which such elevator is located, shall file or transmit for filing in the office of the Superintendent of Buildings, on forms to be furnished by said Superintendent, a full, true and correct report of such inspection, giving the location, description of elevator, date of inspection, by whom made, and the result thereof. If, from the report of such inspection, the Superintendent of Buildings has reason to believe that such inspection is inadequate or improperly made, he is authorized and empowered to require further and additional inspection to be made of any such elevator and to order the operation and use thereof discontinued until such additional inspection is made."

In the case of *Van Winkle v. American Steam Boiler Co.*, 52 N. J. L. 240, 19 Atl. 472, relied on strongly by respondent in support of the judgment, the defendant had insured a steam boiler in a building adjacent to the mill of the plaintiff, which was injured by the bursting of the boiler. The policy in that case contained a provision similar in its import to the quoted clause from the policy in the present case:

" 'Prevention of accidents by explosion being the primary object of this company, it is hereby agreed that the inspector of this company shall, at all reasonable times, have access to said boiler or boilers, and the machinery connected therewith, and every and all facilities be offered to said inspector, when this company shall so desire, for the purpose of making an examination of said boiler or boilers or machinery, and should such inspector, upon said examination, discover any defect affecting the safety of said boiler or boilers or machinery, he shall notify the assured; or should the assured discover any defect, or be notified by any person having any interest therein of any defect or source of danger to said boiler or boilers or machinery, and upon such defect being brought to the knowledge of the assured, or of his agent, the said boiler or boilers or machinery so affected shall cease to be worked until such defects shall be corrected or repaired by the assured to the entire satisfaction and approval of the inspector of this company, and upon a failure so to do, this policy shall become null and void.' "

Construing the policy, the court said it was plain that the defendant company was in nowise obligated by its contract to make any inspections whatever; it acquired the right to do so when it chose to do so, and, if it had altogether refrained from making an inspection, it would seem clear that it would have incurred no responsibility either to the assured or to the plaintiff. But the defendant having, in the exercise of its volition, made repeated inspections of the boiler and

furnished the required certificates, no one could doubt that, by this course of action, a duty was imposed on it, by operation of the contract itself, to act with ordinary care and skill, both with respect to its inspection and its certificate; and that there could be no room to doubt that, for the proximate damage occasioned by the absence of such care and skill, the defendant would be answerable to the assured under the contract. The inquiry, however, said the court, was not with respect to the force of the contract, but altogether as to the legal effect of the acts done under it by the defendant, so far as they affected the rights of the plaintiff, who was a stranger to it. The court said there was a broader ground on which the case could be based. It was that, in all cases in which any person undertakes the performance of any act which, if not done with care and skill, will be highly dangerous to the safety of persons, known or unknown, the law, *ipso facto*, imposes as a public duty the obligation to exercise such care and skill.

"The law hedges round the lives and persons of men with much more care than it employs when guarding their property, so that, in this particular, it makes, in a way, every one his brother's keeper, and, therefore, it may well be doubted, whether in any supposable case redress should be withheld from an innocent person who has sustained immediate damage by the neglect of another in doing an act which, if carelessly done, threatens, in a high degree, one or more persons with death or great bodily harm."

The appellant seeks to distinguish the *Van Winkle* case from the present one by urging that, in the former, by the allegations of the declaration, the insurance company was cooperating in the management of the steamboilers. But the policy of insurance was attached to the declaration and became part of it, and, taking the declaration broadly, it appeared, as the

court there said, that the respect in which the insurer was held negligent was the inspection of the boiler as the agent of the owner, a duty it had voluntarily assumed.

In the present case, the appellant cooperated to the same extent with respect to the management of the elevator. It agreed to perform, for the owner, the duty of inspecting the elevator and reporting its condition to the building department of the city. The quoted evidence of the chief inspector can leave no doubt about this. The testimony of this witness shows that, having assumed the duty of inspection and reporting to the city, the appellant did not actually report to the city the conditions as found from time to time, but, if any repairs or corrections were required, notified the owner alone, and, after being informed by the owner that the repairs were made, without further reinspection, forwarded to the city a report showing the elevator to be in a state of perfect repair.

In *Ward v. Pullman Car Corp.*, 131 Ky. 142, 114 S. W. 754, 25 L. R. A. (N. S.) 343, an action was brought by Ward against the Pullman corporation and a railway company and two of its employees, car inspectors. The Pullman corporation and the railway company, being foreign corporations, filed their petition, asking that the case be removed to the Federal court, and the lower court granted the motion. The defendant car inspectors were citizens of Kentucky, and it was alleged in the petition for removal that the joining of them in the action as defendants was for the fraudulent purpose of maintaining the action in the courts of Kentucky. On appeal, the question was whether, under the facts alleged in the plaintiff's complaint, he could maintain an action against the car inspectors for neglect of their duties. The complaint alleged that the plaintiff, a brakeman, was injured by reason of the

defective condition of an iron brake staff in a freight car, on which he was employed at the time of his injury; that the brake staff was defective and dangerous to operate and in an unsafe condition; that it was the duty of the inspectors to inspect the car and its appliances for the purpose of ascertaining its condition before it was placed in operation or turned over to the employees of the railway company to be made a part of the train.

The Kentucky court of appeals, after stating that there existed a sharp conflict in authorities as to whether a servant is liable to a third person for nonperformance and as to what is nonperformance within the meaning of the rule, continues:

"As to what the true rule is we are not required in this case to decide. The petition here charges more than a mere nonfeasance. The cars could not go out on the road until they were inspected and passed inspection. When the inspectors inspected the cars and approved them, they went out on the road. Their approval sent the cars out on the road for the use of the trainmen, and, if they sent a car out which was defective, and which they knew or by ordinary care could have known was defective, they are as fully liable to the brakeman who was injured by reason of this as if they had with their own hands handed him a wrench telling him it was safe and proper to be used, when it was in fact in a dangerous condition; and they either knew this or could have known it by ordinary care in such inspection as they were required to make. They did not deliver the car by their own hands to the brakeman, but they approved it, and their approval put the car in the hands of the brakeman. It is not a case of mere failure to act, but it is a case of one who was charged with the duty of seeing that the car was safe before delivering it to another to be used with actual knowledge that if it was unsafe it would endanger his life; for they must be charged with knowing what they should have known by the exercise of ordinary care when they made the inspection and passed

the car. If they had not inspected the car at all, and had not approved the car in any way, they would have done no positive act, and a different question would be presented. We therefore conclude that, if they were the only defendants to the action, a recovery might be had against them under the allegations of the petition."

Among the numerous cases cited by the Kentucky court in support of its position is found *Lough v. Davis & Co.*, 30 Wash. 204, 70 Pac. 491, 94 Am. St. 848, 59 L. R. A. 802.

In that case, while the facts were different from those present here, the underlying principle announced by the court supports the respondent's position. The action was against an agent, who was authorized to rent and repair a tenement house, for permitting the house to become unsafe for want of repairs, by reason of which cause the plaintiff was injured. After a discussion of the conflict in authorities, as to the distinction in respect to the liability of an agent, between nonfeasance and misfeasance, the court said:

"There is still another class of cases which hold what seems to us to be the correct doctrine, viz., that the obligation, whether for misfeasance or nonfeasance, does not rest in contract at all, but is a common-law obligation devolving upon every responsible person to so use that which he controls as not to injure another, whether he is in the operation of his own property as principal or in the operation of the property of another as agent. One of the leading cases maintaining this view is *Baird v. Shipman*, a case decided in 1890, and reported in 132 Ill. 16 (23 N. E. 384, 7 L. R. A. 128, 22 Am. St. Rep. 504). There it was held that an agent who has complete control of a house belonging to an absent principal, and who lets the house in a dangerous condition, promising to repair it, is responsible to the third person injured by an accident caused by want of such repair. There is nothing to distinguish this case from the case at bar excepting the

promise to repair, and that does not seem to have been deemed by the court an important feature; but the case was decided upon the broad principle above announced. Said the court:

" 'It is not his contract with the principal which exposes him to or protects him from liability to third persons, but his common law obligation to so use that which he controls as not to injure another. That obligation is neither increased nor diminished by his entrance upon the duties of agency, nor can its breach be excused by the plea that his principal is chargeable. . . . If the agent once actually undertakes and enters upon the execution of a particular work, it is his duty to use reasonable care in the manner of executing it, so as not to cause any injury to third persons which may be the natural consequence of his acts,' citing approvingly *Osborne v. Morgan* [130 Mass. 102], *supra.*"

Summing up, the court, speaking through Judge Dunbar, said:

"In other words, whoever undertakes a duty, and is clothed with authority to perform that duty, is responsible to the party injured for negligent imperfection in the discharge of such duty, on the broad doctrine announced above that he is obligated in transacting business to so transact it that his neighbor shall not thereby be injured; but there is no liability for the non-performance of a duty not assumed, or not independently controlled. But for neither the non-performance nor the malperformance of a positive duty can one escape responsibility, whether that duty is imposed by contract or by general obligation, for under any and all circumstances it is the essence of negligence to omit to do something which ought to be done."

In *Anderson v. London Guarantee & Accident Co.,* 295 Pa. 368, 145 Atl. 431, it is said by the court that one controlling the operation of a boiler is bound to make reasonable inspection to guard against explosions which may cause injuries to his own employees or to

third parties, and that this responsibility may be enforced against an insuring company, citing the *Van Winkle* case, and continues:

"But the right of such an indemnitor to inspect does not impose upon it a duty to do so, though, if it sees fit to exercise the privilege, it becomes responsible for the negligence of those appointed to supervise (*Hartford Steam Boiler Inspection & Ins. Co. v. Pabst Brewing Co.,* 201 Fed. 617), if it fails to put in charge competent individuals: *Anderson v. Hays Mfg. Co.,* 207 Pa. 106."

In that case, the owner of the boiler had applied to the insurance company for insurance. The company detailed one of its inspectors, competent for the work, to determine whether a policy should be issued. The boiler exploded while the test was being made and before the issue of any policy of insurance. While the appellant, as well as respondent, cites this case, we do not think it supports appellant's position. At the time of the explosion, the insurance company had assumed no obligation to the owner, nor the performance of any duty to the public. It was making a preliminary examination for its own information in determining whether it would assume the risk. It did not fail in any duty it owed the public. Here, the appellant, under the right conferred in the policy, assumed the performance of a duty owing by the owner to the public, with the resulting obligation of proper performance.

Our conclusion is that the respondent's action is maintainable, not in virtue of any obligation imposed by the policy of insurance, but because of the legal responsibility attaching to its voluntary assumption, as the owner's agent, of the duty of proper inspection and reporting to the city.

■ Appellant contends that the city ordinance provided no basis for recovery against it.

The ordinance required the quarterly inspection of the elevator and the filing of a report with the city by a competent inspector, who might be a regularly authorized inspector of a liability insurance company in good standing in the state, or an employee or representative of some responsible firm in the business of elevator construction. and maintenance satisfactory to the superintendent of buildings of the city. It will be noted that the ordinance assumed the qualification of an authorized agent of a liability insurance company without the necessity of approval by the building department, whereas any other inspector designated must be approved by the department. The appellant assumed the performance of this duty in accordance with the terms of the ordinance. Having assumed the duty of inspection and reporting to the city, the appellant would be liable at common law to any one sustaining damages by reason of its neglect, the measure of its duty, in respect to inspection and reporting, being fixed by the ordinance. We think this assignment without merit.

■ The appellant's next contention is that there was no causal connection between its inspections and respondent's injury.

The purpose of the ordinance was, of course, to protect the public against injury, and, to this end, inspection was required, on the assumption, necessarily, that proper inspection and reports of existing conditions to the city would tend to eliminate, or at least lessen, the chances of accident and injury. The jury could have found, under the evidence, as it did find, that the elevator door was frequently out of repair and was not adequate for its intended use. The reports made to the city by the appellant's inspector were uniformly,

during the period covered by the evidence, that the elevator was in proper order, thereby assuring the city authorities that they need not concern themselves with its safety.

Another insurance company carried a liability policy on the elevator for a tenant in the building. This company's inspector testified to the condition of the elevator and to having made reports to the city which showed it out of order. Copies of the reports were identified, but not offered in evidence. But, assuming reports to have been made to the city by that company of the elevator's condition, the fact does not exculpate the appellant. Its reports might well be found by the jury to have lulled the building department of the city into a sense of security, in respect to the elevator, and that the reports were causes contributing proximately to respondent's injury.

■ Appellant's final contention under the first group of assignments is that the respondent was guilty of such contributory negligence as debarred his right of recovery.

It was daylight when the respondent returned to the elevator. He testified that he looked into the shaft and thought he saw the elevator there. The door was open, as he had left it when going to supper. His testimony was to the effect that, while he had used the freight elevator a few times during the course of his employment in the building, he had never ridden on it when the doors failed to close automatically, as they were intended to do. The elevator shaft was unlighted. In looking into the shaft, he faced the same blank wall that he would have seen if the elevator floor was at the alley level. The elevator entrance was recessed in the thickness of the wall some fourteen inches, this fact tending, of course, to cast the shaft into deeper shadow.

Gagnon testified that, when he approached the shaft, he noticed the absence of the elevator, and it might be urged that the respondent should have seen what was observed by his employer; but Gagnon also testified that, as he approached the entrance, he heard voices at the bottom of the shaft, and there was a light coming from a Chinese store in the basement, the door from the shaft to the store having been opened after the respondent's fall. He also testified that he was aware of the fact that the doors were frequently out of order and failed to close automatically.

In *Perrault v. Emporium Department Store Co.,* 71 Wash. 523, 128 Pac. 1049, the court states that it is in full accord with the view expressed in *Tousey v. Roberts,* 114 N. Y. 312, 21 N. E. 399, 11 Am. St. 655, that

" 'An elevator for the carriage of persons is not, like a railroad crossing at a highway, supposed to be a place of danger, to be approached with great caution; but, on the contrary, it may be assumed, when the door is thrown open by an attendant, to be a place which may be safely entered without stopping to look, listen or make a special examination.' "

While this rule might not be strictly applicable in the case of a freight elevator, where there is no attendant to open and close the doors, yet the fact, known to the respondent, that the doors were devised to automatically remain open when the elevator was at the alley, could well be taken as an invitation to enter in safety. While it is true that the respondent could not rush heedlessly into obvious danger, we think it was for the jury to say whether he did what a reasonably prudent person would do under all the circumstances.

The appellant contends that a new trial should be granted on account of the improper reception of evidence and faulty instructions given by the court.

It is first urged that the court erred in permit-

ting the reception of evidence as to the general operating conditions of the elevator from October 1, 1935, to the date of the accident, notwithstanding the fact that an exhibit, prepared by one of appellant's own witnesses, an inspector for another insurance company, showed that the elevator was in good condition March 17, 1936. The exhibit referred to was identified, but not offered in evidence.

But, assuming the witness to have testified with respect to the condition of the elevator on the day named, the same witness also testified that, owing to their basic inadequacy, the doors might become out of order within a few minutes after their inspection. The court permitted this class of testimony, as well as other testimony to which appellant objects, as evidence tending to show the condition of the elevator doors and their being liable, owing to faulty construction, to become out of order.

A truck driver familiar with the doors testified that the catch that held the doors open at the floor where the elevator was in use, would sometimes jar loose when someone stepped on the platform, and that he himself was once caught between the doors under such circumstances. The appellant objected to the evidence on the ground that the basis of respondent's action was the failure of the doors to close when they should have closed, and that evidence tending to show that they closed when they should not have closed was not admissible.

The witness, of course, was explaining the general faulty condition of the doors. This condition would be evidenced as well by their premature closing as by their failure to close at all when the elevator moved away from the landing.

Complaint is made about the introduction of evidence as to the lighting condition in the elevator, the

basis of the objection being that, whatever the condition of lighting, it could not have induced the accident. The respondent did not offer the evidence for the purpose of fixing in any way responsibility on the appellant, but as tending to negative any inference of negligence on his part in not being warned by the absence of a light when he entered the shaft. The court did not err in permitting the evidence. In any event, it could not have been prejudicial to the appellant.

Most of the appellant's objections to the court's instructions are disposed of by our discussion of the respondent's right to maintain the action.

█ Objection is made to instruction No. 7, which advised the jury that, by ordinance of the city of Seattle, it is provided:

" 'Every fire-proof enclosure door leading to a freight elevator shall be arranged to close automatically when the elevator leaves the floor at which said door is located; or such door may be fastened open by a fusible link that will fuse at a temperature of 180 degrees Fahrenheit, allowing the door to close automatically, provided the freight elevator or the enclosure at each floor is equipped with an additional door or gate at least five feet six inches (5 ft. 6 in.) high and built of fire-proof materials.' "

By instruction No. 8, the jury was told that a violation of the ordinance was in itself negligence. The objection of appellant is based on the contention that the ordinance is a fire ordinance and not one attempting to fix a civil liability on the owner or anyone else.

The ordinance was a positive law of the city requiring a certain type of elevator door in a situation such as was present here. The witness Schoenberg, an elevator inspector employed by the Moline Elevator Company, testified that the elevator doors in the Stirrat

building were fire-proof enclosure doors. They were, therefore, of the type which, by the ordinance, were required to close automatically, if not fastened open by a link fusing at a stated temperature; and, in such a latter case, the elevator, or the enclosure at each floor, was required to be equipped with an additional door or gate built of fire-proof material. While this ordinance may be characterized as one primarily for fire protection, it undoubtedly also had relation to protection of persons against the hazard of unguarded elevator shafts. Not having fusible links, the ordinance required that the door be equipped to close automatically. The doors were designed to close automatically, and the sole question before the jury was whether they performed their proper function. The court did not err in giving the instruction.

■ The court's instruction No. 12-a was as follows:

"You are instructed, members of the jury, that the owner of a freight elevator is only required to use ordinary care in installing and keeping the said elevator and its gates in repair and operating condition. The owner is not required to install any other or different type of elevator or device as long as he uses such care as is ordinarily used by the owners of other properties where freight elevators are in operation.

"I therefore instruct you that if you find from the evidence in this case that the owner of this building used such care, the Aetna Casualty & Surety Company would not be liable in this case, *unless you find that this company was negligent in some other respect as defined in these instructions.*"

The appellant objects to the closing lines of the instruction which we have italicized.

While the last phrase of this instruction was unnecessary and seemingly contradictory to what was said immediately before, we do not think it was prejudicial, since its import was to call the jury's attention

to the other instructions properly defining, as a whole, the conditions under which the appellant could be found negligent.

The judgment is affirmed.

BLAKE, C. J., MAIN, BEALS, and MILLARD, JJ., concur.

STEINERT and JEFFERS, JJ., concur in the result.

ROBINSON, J. (dissenting)—I am of the opinion that respondent's evidence shows that he was guilty of contributory negligence. I quote, briefly, from his own testimony:

"Q. What next did you do after you saw the doors were open? A. Well, I suppose I stepped through them. I imagine that would be the next thing. Q. You stepped right into the entrance? A. Yes. Q. Where was the elevator then? A. I don't know. Q. Did you look to see? A. No; I did not."

At another place in the transcript of his evidence, I find the following:

"Q. When you walk up to an elevator do you not look to see what you are going to step on before you step into an elevator shaft—do you not do that any time you get into any elevator? A. Not if the doors are open and the elevator appears to be there I don't bother to look at the floor—I step on. Q. A freight elevator where you know there is no operator, you do that? A. Yes."

In dealing with the matter of contributory negligence, the majority points out that this court has heretofore quoted, with approval, the following excerpt from a New York case, *Tousey v. Roberts,* 114 N. Y. 312, 21 N. E. 399, 11 Am. St. 655:

"An elevator for the carriage of persons is not, like a railroad crossing at a highway, supposed to be a place of danger, to be approached with great caution; but, on the contrary, it may be assumed, when the door is thrown open by an attendant, to be a place which

may be safely entered without stopping to look, listen or make a special examination."

In leading up to the quotation, this court said (*Perrault v. Emporium Department Store Co.*, 71 Wash. 523, 527, 128 Pac. 1049):

"In *Tousey v. Roberts*, the plaintiff entered a hallway from the street, walked towards the elevator, and as she approached it the door was thrown open."

It will be noted from the above quotations that the New York case was specifically concerned with an elevator for the carriage of persons, and that an attendant threw the door open as plaintiff approached it. The wide factual differences between that case and this are so glaringly apparent as not to require elaboration.

It seems to be contended, however, that, since the freight elevator opening was through the east side wall of the building, and, therefore, in the afternoon shadow of the building, the jury was entitled to infer that, even if the respondent had looked, he could not have seen whether the elevator was there or not; and hence, even if it was negligence not to look, such negligence would not be a contributing cause of his injury.

The opening in the wall was at least six feet wide, and the alley pavement extended into it a scant fourteen inches to the place where the elevator floor and pavement met. The whole construction, therefore, was virtually out in the open. As the accident happened on a bright, clear, sunny August day, fifty-four minutes before sunset, there is, in my opinion, no room whatsoever for an inference that it was so dark in that alley that the respondent, if he had looked, could not have readily seen that the elevator was not there. Nor is there anything in the record to indicate that the jury drew such an inference. It is infinitely more reasonable to suppose that it simply agreed with the respond-

ent that one is entitled to step into any open elevator shaft without looking. At any rate, the majority opinion will inevitably be cited as supporting that proposition. It may be that this should be the rule, but I am not yet convinced that it should.

I therefore dissent.

SIMPSON, J., concurs with ROBINSON, J.

