[No. 30739. Department Two. November 16, 1949.]

AXEL ELLINGSON, *Appellant,* v. AMERICAN MAIL LINE, LTD., *et al., Respondents,* MARINE SERVICE, INC., *et al., Appellants.*[1]

[1]Reported in 211 P. (2d) 491.

*Walthew & Gershon, Frank Pellegrini,* and *Jack P. Schol-field,* for appellants.

*Bogle, Bogle & Gates* and *Robert V. Holland,* for respondents.

HAMLEY, J.—This case involves the question of whether, under the circumstances shown to exist, either the master of, or the general agent for, a vessel owned by the United States government is liable for injuries sustained by a workman employed on the vessel while it was in port.

Plaintiff, Axel Ellingson, was injured on December 6, 1945, while in the employ of Marine Service, Inc., as a ship scaler on board the S. S. "Peter Moran." The gang of ship scalers of which he was a member had spent the day scaling in the deep tanks located at the bottom of No. 1 hatch. During the day the lights in the No. 1 deep tank failed five or six times. On each such occasion the lead man for the scaling gang would notify a member of the ship's company, and within a short period of time the lights in the tank would again come on.

At about four o'clock p. m., the lights again failed, and report was immediately made through the lead man to a

member of the ship's company. The lights were not turned on, and the gang of scalers remained in the tank in complete darkness until about five o'clock p. m. Someone on deck then ordered the men out of the hold, and they began to ascend the ladder leading out of the hold. A flashlight which a member of the crew was using at the top to assist the scalers was apparently withdrawn while plaintiff was still on the ladder. He was left in total darkness. He attempted to complete his exit by feeling his way sideways on a narrow wall along a bulkhead. His clothing caught on a projecting nail, and he fell backwards into the deep tank, causing the injuries for which he here seeks recovery.

He brought this action against defendants American Mail Line, Ltd., and Clifford C. Bertiaux. He alleged that American Mail Line, as general agent, operated the vessel in maritime commerce; that Bertiaux was the master of the vessel at the time of the accident; and that both defendants were liable because of their failure to provide plaintiff with a safe place in which to work. Marine Service, Inc., and Fireman's Fund Insurance Company intervened because of their right to be subrogated to a portion of any recovery made by plaintiff. The interveners have joined in this appeal, but we will use the term plaintiff or appellant to designate Ellingson only.

Both defendants denied liability on the ground that plaintiff was contributorily negligent. In addition, each defendant denied liability on the ground that it was not chargeable with any primary negligence which may have been the cause of the accident.

The case was tried to a jury, which returned a verdict for plaintiff against both defendants in the amount of $8,526.80. Defendants then moved for judgment notwithstanding the verdict, on the ground that plaintiff failed to prove any negligence on the part of either defendant which caused or contributed to the accident, and on the further ground that plaintiff was guilty of contributory negligence as a matter of law. The court granted the motion, whereupon plaintiff took this appeal.

The first question presented is with respect to the liability of respondent Bertiaux, assuming that appellant was injured because he was not provided with a safe place in which to work, and that he was not contributorily negligent.

The evidence was undisputed that Bertiaux, the master of the S. S. "Peter Moran," had left the vessel about noon on the day of the accident (which happened about five o'clock p. m.) and did not return until the following morning. He had left the chief officer in charge of the vessel. There was no evidence that Bertiaux had any prior knowledge of a defect in the lighting system of the hold. No attempt was made to show that he had hired ship's officers and crewmen who were known to him to be incompetent or inexperienced. It was not contended that the master was negligent in absenting himself from the ship at this time. It was not shown that the orders and directions left by the master to govern in his absence were inadequate in any particular. There was accordingly a complete failure to show that Bertiaux was personally negligent.

 It is well established that the master of a vessel is not liable for the negligence of other ship's officers and crewmen, where the master has used reasonable care in their selection, and has left the vessel in their charge under appropriate orders. As stated in American Jurisprudence, in discussing the liability for negligence of the master:

"It is his duty, and not that of the owners, to see that a competent and duly qualified officer is in actual charge of the vessel, even when not on the high seas. If, however, he procures competent persons, and gives them orders to perform their duties, the law will not impute guilt to him, if they, without his knowledge, neglect the duties assigned to them." 48 Am. Jur. 83, § 116.

See, also, 58 C. J. 287, § 399; Marsden's Collisions at Sea, (8th ed.), 73.

In *P. Dougherty Co. v. Mannesis,* 51 F. Supp. 966, where the master was absent from the vessel at the time of a collision caused by a dragging anchor, it was contended that the master would be liable because he did not anticipate

and guard against the negligence of his subordinates during his absence. In rejecting this contention, the court said:

"I do not think the master can be held liable for the damages. He was absent at the time of the collision, he had left the vessel in charge of a licensed master, and was not in control of the vessel when the damage was done. The master was not the master at the time of the collision, for in his absence the chief officer was in charge of the ship, with all the responsibilities, duties and powers of the master. *Escandon v. Pan-American Foreign Corp. D. C.*, 12 F. Supp. 1006. . . . There is no evidence here that the chief officer was incompetent or inexperienced, and the mere absence of the master from the vessel at the time of the collision, under the facts of the case, are not sufficient to impose liability upon him for the damage done through the fault of the vessel." (p. 967.)

The court cited, with approval, *Escandon v. Pan American Foreign Corp.*, 12 F. Supp. 1006, affirmed 88 F. (2d) 276, in which it was held that, in the absence of the master, the chief officer was in charge of the ship "with all the privileges, duties, and obligations of the master." The court also distinguished *The Newport*, 15 F. (2d) 342, modified *sub nom. Wilson v. Pacific Mail S. S. Co.*, 276 U. S. 454, 72 L. Ed. 651, 48 S. Ct. 369, wherein the master was found liable for damages due to a collision. In the *Newport* case, the collision occurred while the master was on board and commanding, and at a time when a concededly inexperienced third officer was in charge of the vessel. It was held that the master failed to show that he took reasonable precaution to insure proper navigation in circumstances of obvious danger.

We conclude that, since there was no showing of personal negligence on the part of the master, it must be held, as a matter of law, that respondent Bertiaux is not liable for damages by reason of the injuries sustained by appellant. Accordingly, as to him, the court properly granted the motion for judgment notwithstanding the verdict.

The next question presented is with respect to the liability of respondent American Mail Line, assuming that ap-

pellant was injured because he was not provided with a safe place in which to work, and that he was not contributorily negligent. In order to discuss this question, it is necessary to state, in some detail, the nature of the agency arrangement between American Mail Line and the United States government.

On August 3, 1941, the United States government, acting by and through the war shipping administration, entered into a wartime standard form of agency agreement, GAA 4-4-42, with American Mail Line, Ltd., under which the latter agreed to manage certain phases of the business of ships owned by the United States and operated by the war shipping administration. On February 4, 1944, the S. S. "Peter Moran" was assigned to American Mail Line under the terms and conditions of the general agency agreement. The vessel continued subject to such agreement on the date of the accident.

Under the general agency agreement, the general agent is appointed by the United States "as its agent and not as an independent contractor," to manage and conduct the business of vessels assigned to it. (Art. 1) The general agent agrees to manage and conduct the business for the United States, in accordance with such directions, orders, or regulations as the latter has prescribed, or from time to time may prescribe. (Art. 2) The general agent agrees to maintain the vessels in such trade or service as the United States may direct, subject to its orders as to voyages, cargoes, priorities of cargoes, charters, rates of freight and charges, and as to all matters connected with the use of the vessels; to collect all moneys due the United States under the agreement; to deposit, remit, or disburse the same in accordance with regulations prescribed by the United States; and to account for all moneys collected or disbursed. (Art. 3A)

The general agent also agrees to "equip, victual, supply and maintain the vessels," subject to such directions, orders, regulations, and methods of supervision and inspection as the United States may from time to time prescribe; to

procure the masters of the vessels subject to the approval of the United States; to procure and make available to the master for engagement by him the officers and men required by him to fill the complement of the vessel; to issue to shippers freight contracts and bills of lading. (Art. 3A) The general agent is also to "arrange for the repair of the vessels," and to exercise reasonable diligence in making inspections and obtaining information with respect to the state of repair and condition of the vessels, and so advise the United States from time to time. (Art. 14)

The agreement provides that "the master shall be an agent and employee of the United States"; that the master "shall have and exercise full control, responsibility and authority with respect to the navigation and management of the vessel"; and that "the officers and members of the crew shall be subject only to the orders of the master." (Art. 3A(d))

Under this contract, American Mail Line handled all business matters in connection with the operation of the S. S. "Peter Moran," subject to general supervision by the war shipping administration. The expenses incurred by American Mail Line in providing these services were paid by the company out of government funds by means of checks signed "United States of America War Shipping Administration, American Mail Line, Ltd., General Agent, Special Account." The company was compensated for its services on a husbanding basis at rates not disclosed in the record, but estimated to yield average revenue of fifteen thousand dollars a voyage, for voyages to the Orient.

The transaction which resulted in Marine Service, Inc., placing a gang of ship scalers on the S. S. "Peter Moran" was handled in the customary manner contemplated by the agency agreement. The war shipping administration office in Seattle advised the American Mail Line that certain scaling was required. The port engineer of American Mail Line then called for bids. Marine Service, Inc., submitted the acceptable bid. The contract was signed by Marine Service, Inc., and war shipping administration. The con-

tractor was paid by check by the American Mail Line in the manner indicated above.

■■ In view of this analysis of the duties and responsibilities of American Mail Line under the general agency contract, and of its part in the transaction with Marine Service, Inc., it is clear that no liability can attach to American Mail Line in this case. The company served only in the capacity of business manager for the ship. It had no function to perform with respect to the conduct of what went on aboard the ship in the usual and ordinary course of the ship's operation. Having no such function to perform, it owed no duty to appellant to provide a safe place for him to work, or to provide competent ship's officers and crewmen.

In cases where we have found the agent liable to third persons for injuries sustained on premises covered by the agency agreement, the agent was shown to be in active control of the premises and had undertaken to maintain the premises in a safe condition. *Lough v. John Davis & Co.*, 30 Wash. 204, 70 Pac. 491, 94 Am. St. 848, 59 L. R. A. 802, and cases there cited; *Sheridan v. Aetna Cas. & Surety Co.*, 3 Wn. (2d) 423, 439, 100 P. (2d) 1024.

The supreme court of the United States has, in two recent cases, held that an identical general agency contract did not place the agent in such possession and control of the vessel as to make the agent liable for injuries suffered, in one case, by a stevedore, and in the other case, by a seaman.

In the first of these cases, *Caldarola v. Eckert*, 332 U. S. 155, 159, 91 L. Ed. 1968, 67 S. Ct. 1569, 1571, the supreme court sustained a judgment of the New York court of appeals affirming the appellate division in setting aside a verdict for the stevedore. The court said, in part:

"The United States, as *amicus curiae*, submitted what we deem to be conclusive considerations against reading the contract so as to find the Agents to be owners *pro hac vice* in possession and control of the vessel. The consequences, to both the national and international interests of the United States, of such a construction would be too far-reaching to warrant such a forced reading merely in order

to have a basis on which to build liability under the law of New York. Serious issues affecting the immunity of Government vessels in foreign ports as well as immunity from regulation and taxation by local governments would needlessly be raised. After all, the question is not whether petitioner may be compensated for his injury. Congress has made provision for that. Petitioner insists, in order to enable him to sue in the courts of New York, that the Agents are to be deemed, as a matter of federal law, owners of the vessel *pro hac vice* and, therefore, as a matter of State Law, subject to the duties of such ownership under New York law toward business invitees. We reject this construction." (p. 159.)

The supreme court intended its determination of the relationship between an agent and a stevedore, under the general agency contract, to be binding upon state courts. At the same time, the court acknowledged that, once that relationship is established, the state court has the final say as to whether tort liability attaches. The court said:

"The New York Court of Appeals authoritatively determines who is liable, in New York, for such an occurrence as that of which Caldarola complains. Insofar as the issues in this case exclusively concern New York law, that court had the final say in holding that one in the relation of the respondents to the petitioner is not liable for the tort of which the latter complains. But to the extent that the determination of tort liability in New York is entangled with the construction of the contract between the Agents and the United States, the interpretation of that contract is a matter of federal concern and is not concluded by the meaning which the State court may find in it." (p. 158.)

Appellant seeks to distinguish the *Caldarola* case by pointing out that in New York, unlike Washington, an agent can be held liable to third persons only in the event of misfeasance, and not where only nonfeasance is shown. *Lough v. John Davis & Co., supra,* is cited in support of this difference in the rule of agency liability applied in the two states. But in the *Lough* case, and the authorities there cited, it is made clear that, whether the liability of an agent is based on misfeasance or nonfeasance, it can only attach where the agent has control and management of the prin-

cipal's premises. Both the New York court and the United States supreme court held, in the *Caldarola* case, that the agent has no such control and management under this form of contract. The *Caldarola* decision is accordingly directly in point.

In the very recent case of *Cosmopolitan Shipping Co. v. McAllister*, 337 U. S. 783, 93 L. Ed. 1278, 69 S. Ct. 1317, 1324, 1326, the supreme court reached the same conclusion with respect to injuries sustained by a seaman. After analyzing the agency agreement at length, the court said:

"It is thus seen that the duties of the respondent were expressly and intentionally limited to those of a ship's husband who has been engaged to take care of the shoreside business of the ship and who has no part in the actual management or navigation of the vessel. . . .

"Thus the cases and an analysis of the relations established by the standard form agreement lead to the conclusion that an agent such as Cosmopolitan, who contracts to manage certain shoreside business of a vessel operated by the War Shipping Administration, is not liable to a seaman for injury caused by the negligence of the master or crew of such a vessel." (pp. 796, 800.)

*Hust v. Moore-McCormack Lines*, 328 U. S. 707, 90 L. Ed. 1534, 66 S. Ct. 1218, which had been distinguished in the *Caldarola* case, was expressly overruled in the *Cosmopolitan* case.

We hold that, as a matter of law, American Mail Line is not liable for the injuries sustained by appellant, and that it was therefore proper for the trial court to grant the motion for judgment notwithstanding the verdict. Our conclusions with respect to the questions discussed above make it unnecessary for us to consider whether appellant was guilty of contributory negligence as a matter of law.

Affirmed.

SIMPSON, C. J., ROBINSON, MALLERY, and HILL, JJ., concur.