5 P.3d 49 (2000)
Shawn MENEELY; Donald and Kathleen Meneely, husband and wife, Respondents,
v.
S.R. SMITH, INC., a foreign corporation; John Williamson and Jane Doe Williamson, husband and wife; Jacuzzi, Inc., a foreign corporation; Don Jones and Betty J. Jones, husband and wife d/b/a Pool And Patio Supply, a Washington corporation; Boise Cascade Corporation d/b/a Tri-City Lumber Yards/Best Way Building Center, a foreign corporation; Martin Samuelson, an Oregon resident; Plastimayd Corporation, a foreign corporation, and John Does AC, Defendants,
National Spa Pool Institute, an Illinois corporation, Appellant.
No. 18036-1-III.
Court of Appeals of Washington, Division 3, Panel Five.
August 3, 2000.
As Amended August 17, 2000.
*51 Robert J. Roche, Jerret E. Sale, Bullivant, Houser, Bailey, Seattle, for Appellant.
Fred M. Zeder, Jan E. Peterson, Peterson, Young, Putra, Fletcher & Zeder, Seattle, for Respondents.
Todd W. Rosencrans, Thomas J. McLaughlin, Perkins, Coie, Bryan P. Harnetiaux, Gary N. Bloom, Harbaugh & Bloom, Debra L. Stephens, Spokane, Amicus Curiae.
*50 SCHULTHEIS, J.
The National Spa and Pool Institute (NSPI) is a trade association whose membership consists of manufacturers and retailers of swimming pools and related equipment. Since 1959, it has drafted and published voluntary safety standards for the swimming pool industry. NSPI's safety standards permitted the use of an S.R. Smith, Inc., 606 jump board on an NSPI Type II pool. The standards also set minimum dimensions for a Type II pool. In the early 1970s, a study commissioned by NSPI showed that young, tall, athletic males risked serious injury when using this board and pool combination. Instead of revising the standard to ban the board from Type II pools, NSPI initiated a program to encourage divers to "steer up" upon entering the water.
In 1991, 16-year-old Shawn Meneely broke his neck when he dove from an S.R. Smith 606 jump board into a pool owned by Mr. and Mrs. John Williamson. The fracture paralyzed him from the neck down. Mr. Meneely sued several defendants, including NSPI. The superior court held that NSPI owed him and other consumers a duty to exercise due care in formulating its safety standards and to warn them about the risk of injury. The court based its decision on the voluntary rescue doctrine, as set forth in Brown v. MacPherson's, Inc., 86 Wash.2d 293, 545 P.2d 13 (1975). The jury found NSPI breached its duty and was the proximate cause of 60 percent of Mr. Meneely's $11 million in damages.
NSPI appeals. The primary issue on review is whether a trade association such as NSPI owes a duty of care to the ultimate consumer. We hold it does when it undertakes the task of setting safety standards and fails to change those standards or issue warnings after it becomes aware of a risk posed by the standards. We therefore affirm.

FACTS
Mr. Meneely described the dive that rendered him a quadriplegic, as follows: He stated he ran from the rear of the board, hopped on the end, and dove headfirst into the pool, with arms and legs extended, then drew his limbs into his body before entering the water. His head hit the pool's transition slope, which is the slope between the floor of the deep end of the pool and the beginning of the pool's shallow portion. Mr. Meneely was using the pool as a guest of Mr. Williamson's grandson.
On March 19, 1993, Mr. Meneely and his parents Donald and Kathleen Meneely (hereafter referred to collectively as Mr. Meneely) filed this lawsuit against Mr. and Mrs. Williamson (hereafter Mr. Williamson) and various "John Doe" defendants, alleging causes of action for negligence, products liability, and breach of express and implied warranties. Mr. Meneely subsequently amended his complaint to name as defendants the manufacturer and the retailer of the pool liner, the manufacturer and the retailer of the diving board, and NSPI.
Mr. Meneely claimed that the defendants were liable to him because they represented to consumers such as Mr. Williamson that the board he purchased was safe to use in his pool. Specifically, in 1965, Mr. Williamson purchased a "hopper bottom" pool that Mr. Meneely contended was an NSPI Type II pool. At the same time, Mr. Williamson installed a diving board. In 1974, Mr. Williamson replaced the original board with one of a like kind manufactured by S.R. Smith. He bought the board from Don Jones of Pool and Patio Supply, and Mr. Jones's employees installed it. A label affixed to the new board stated that it was designed for use in NSPI *52 Type II pools. According to Mr. Meneely, NSPI knew no later than 1971 that the S.R. Smith board was unsafe for use in Type II pools, but it did not change its safety standard.
Mr. Meneely entered stipulated orders dismissing the defendants other than NSPI before trial. NSPI unsuccessfully moved to dismiss Mr. Meneely's lawsuit against it on the ground he filed the suit outside the time period prescribed by the construction statute of repose, RCW 4.16.310. The court also rejected NSPI's additional motion for summary judgment on the issues of (1) whether it owed a duty of reasonable care to Mr. Meneely in formulating its safety standards, and (2) whether the alleged deficiency in its safety standards was the proximate cause of Mr. Meneely's injuries.
The evidence at trial focussed first on whether Mr. Williamson's pool was an NSPI Type II pool. A Type II pool measures 7 feet 6 inches at its deepest point, and 22 feet from the back wall of the deep end to the top of the transition slope.[1] Its transition slope has a 3:1 rise.[2] Mr. Williamson's pool is 7 feet 9 inches at its deepest point, and measures 19 feet to the top of the transition slope. Its slope has a 2:1 rise. Although Mr. Meneely's expert witnesses admitted that the dimensions of Mr. Williamson's pool did not exactly match the minimum dimensions of the Type II pool, they were of the opinion that its dimensions were "within practical limits" the same. Specifically, the slopes matched in the critical area where Mr. Meneely hit his head. Merle Dowd, who was the director of special projects for NSPI in the early 1970s, testified that in his experience, "all pools that were manufactured where the parts were components ... put together on site and ... had a vinyl liner that was made to fit that design ... were consistent with the NSPI standards." (Emphasis added.) This consistency enabled consumers to install pools without having to order each part custom made.
Mr. Meneely also introduced evidence that the jump board was unsafe for use in an NSPI Type II pool. In 1981, a study performed for the Council for National Cooperation in Aquatics demonstrated that the Type II pool was unsafe for use with a diving board such as the S.R. Smith 606 jump board. And, expert analysis of studies performed by Dr. Gale Margaret Gehlsen of Ball State University for the Consumer Products Safety Commission and for Mr. Meneely's lawsuit reached similar conclusions. From an underwater viewing room, Dr. Gehlsen videotaped divers in a much deeper pool, then superimposed the dimensions of the Type II pool over their trajectories. Dr. Gehlsen's assistant in that study was John Wingfield, who at the time of trial was the director and head coach of the Indiana Regional Training Center for United States Diving. Based upon the data gathered in these studies, he stated that a diver of Mr. Meneely's height and weight who executed a two-step dive and catapulted from a jump board would impact the pool's transition slope at velocities sufficient to break his neck. Kim William Tyson, aquatics coordinator at the University of Texas, agreed. Mr. Tyson called a 606 jump board on a Type II pool "the most dangerous combination ... out there[.]"
Finally, Mr. Meneely presented evidence that by the early 1970s, and before Mr. Williamson installed his replacement board in 1974, NSPI knew of the risk associated with the use of the jump board in Type II pools. Yet, NSPI did not change the safety standard that permitted use of these boards. Milton Costello is a consulting engineer who was a member of NSPI and had participated in formulating NSPI safety standards. He testified that in 1971 people in the industry were focusing on safety concerns because of lawsuits brought by persons injured while diving. In addition, the Consumer Products Safety Commission was critical of NSPI standards. In the Commission's view, the standards "lack[ed] [the] technical rationale required to quantify the safe physical parameters" for use of boards in residential pools, *53 because they were not premised upon safety performance tests. Mr. Dowd admitted that the periodical, Swimming Pool Weekly, correctly quoted him as stating at a round table discussion held at NSPI's national convention in 1971, as follows: "Increasingly, as I've been visited by lawyers in Washington [D.C.], they're looking deeper. And I think that when the stakes get high enough, they're going to want to look at the standards makers[.]" (Emphasis added.) He drew this conclusion from the questions the lawyers were asking, such as, "[w]ho made these standards? ... How were these standards drawn and for what reasons? Were they drawn so you could manufacture this pool or you could build this pool? Or were they drawn because of an abiding concern for safety of people that are going to use them?" (Emphasis added.)
Larry Paulick was NSPI's technical director from 1972 to 1974. He testified that in 1973 NSPI hired the Arthur D. Little Corporation (ADL), a Cambridge, Massachusetts research firm, to perform diving tests. On June 10, 1974, ADL issued the report of Dr. Richard S. Stone. Dr. Stone concluded that "[w]ithin practical limits of pool design depth for either a running dive or from a spring or jump board of 1 meter height, it is not possible to rely only on the slowing effect of the water to assure that the diver will not impact the bottom of the pool at dangerous velocities." (Emphasis added.)
Lief Zars is a pool designer and builder who chaired the standards and codes committee for NSPI's Technical Council in 1974. He was the liaison between ADL and NSPI. He testified that following receipt of the Stone Report, the standards and codes committee determined more tests were needed. In October 1974, the diving board subcommittee reported that "for either a running dive or a dive from a diving board or jump board, the primary protective mechanism is the action of the diver rather than the slowing effects provided by the passage of his body through water." (Emphasis added.) In other words, since very few divers were injured, the subcommittee determined that the divers must be using their hands and arms to steer up as soon as they entered the water. Accordingly, NSPI decided not to change the standard. Instead, it published a brochure entitled, "The Sensible Way to Enjoy Your Pool" that described the steering up technique, and sent it to its members to distribute with their products.
On the strength of this evidence, the jury found NSPI liable to Mr. Meneely for negligence, and responsible for 60 percent of their $11 million in damages. NSPI appeals, contending (1) the construction statute of repose barred Mr. Meneely's claim; (2) it owed no duty to Mr. Meneely; (3) its safety standards were not the proximate cause of Mr. Meneely's injuries; and (4) the court's rulings on several evidentiary questions prejudiced it.
We set forth additional facts below, with the issues they concern.

ANALYSIS
1. Statute of Repose.
RCW 4.16.310 provides an absolute bar to any action against a person who has performed construction related services for an improvement to real property, that has not accrued within six years of substantial completion of the project. It reads as follows:
All claims or causes of action as set forth in RCW 4.16.300 shall accrue, and the applicable statute of limitation shall begin to run only during the period within six years after substantial completion of construction, or during the period within six years after the termination of the services enumerated in RCW 4.16.300, whichever is later.... Any cause of action which has not accrued within six years after such substantial completion of construction, or within six years after such termination of services, whichever is later, shall be barred[.]
RCW 4.16.300 identifies design services as subject to the construction statute of repose. It reads as follows:
RCW 4.16.300 through RCW 4.16.320 shall apply to all claims or causes of action of any kind against any person, arising from such person having constructed, altered or repaired any improvement upon real property, or having performed or furnished any design, planning, surveying, *54 architectural or construction or engineering services ... of any improvement upon real property. This section is intended to benefit only those referenced herein and shall not apply to claims or causes of action against manufacturers.
(Emphasis added.)
NSPI contends that the superior court erred when it refused to apply RCW 4.16.310 to this case. Specifically, NSPI argues that the court should have granted its motion to dismiss Mr. Meneely's action against it on the ground the suit concerned NSPI's design services for Mr. Williamson's pool. And, Mr. Meneely's action accrued more than six years after Mr. Williamson installed the swimming pool and diving board.
In denying the motion for summary judgment, the court held that "National Spa and Pool Institute ... [did not] participate[] in the activities identified in RCW 4.16.300 with respect to [Mr. Williamson's] pool. [NSPI was not] directly involved with the improvement of the real property as contemplated by these statutes and the case law interpreting the statutes, particularly Condit vs. Lewis Refrigeration Co., 101 Wash.2d 106[, 676 P.2d 466] (1984)."
NSPI argues that the minimum pool dimensions specified in its safety standards amounted to "design services," as that term is used in the statute of repose. It has not cited, nor did we find, any authority addressing whether safety standards that provide for minimum design dimensions fall within RCW 4.16.300 or similar statutes from other jurisdictions.
The issue of whether NSPI, in formulating its safety standards, provided "design services" that fall within the application of RCW 4.16.300, presents a question of statutory interpretation. "[I]n interpreting a statute, it is our duty as a court to ascertain and give effect to the intent and purpose of the legislation as expressed in the act as a whole." Condit v. Lewis Refrigeration Co., 101 Wash.2d 106, 110, 676 P.2d 466 (1984). "RCW 4.16.300 and .310 were adopted to protect architects, contractors, engineers, surveyors and others from extended potential tort and contract liability." Hudesman v. Meriwether Leachman Assocs., Inc., 35 Wash.App. 318, 321, 666 P.2d 937 (1983) (citing Pinneo v. Stevens Pass, Inc., 14 Wash. App. 848, 545 P.2d 1207 (1976)). "The protection is based on the premise that the longer the owner possesses the improvement, `the more likely it is that the damage was the owner's fault or the result of natural forces.'" Pfeifer v. City of Bellingham, 112 Wash.2d 562, 568, 772 P.2d 1018 (1989) (quoting Jones v. Weyerhaeuser Co., 48 Wash. App. 894, 899, 741 P.2d 75 (1987)). In further discerning the purpose of RCW 4.16.300, the court in Condit relied upon the statute's language, which lists various construction activities, "including designing, planning, surveying, architectural, or construction or engineering services," as subject to the six-year accrual period. Condit, 101 Wash.2d at 110, 676 P.2d 466. The court observed these activities concerned the process of building a structure. Id. The court, therefore, concluded that the statute applied to individuals whose activities related to building the improvement. Id. at 111, 676 P.2d 466.
Here, NSPI's general counsel, David Karmol, testified that NSPI did not build or design pools or pool products. He stated that NSPI standards are not a blueprint for any particular pool; rather they set forth recommended, minimum dimensions. At argument on the summary judgment motion, Mr. Meneely's attorney noted that NSPI's standards can be applied to varying pool designs. He argued that the pool "could be kidney shaped. It could be L shaped. It could be round. This pool could be of any length. It could be 30 feet long. It could be 120 feet long and still comply with NSPI standards." It follows that the formulation of a safety standard applicable to all swimming pools that are intended for use with a diving board, is different in kind from the design of a particular swimming pool, in which the minimum dimensions of the safety standard are encompassed. RCW 4.16.310 applies to the latter activity, but not to the former.
NSPI makes much of the fact that Mr. Meneely's attorney characterized NSPI's standard as a "product" rather than a "service," *55 but at trial three years later proceeded under a common law negligence theory rather than a products liability theory. The attorney's characterization is immaterial. NSPI's duty of care did not arise from either a service provided during construction or from a role as a manufacturer of a product. It arose from its voluntary assumption of the task of formulating safety standards, knowing that the pool industry would conform its products to those standards. See Issue 2 infra. The latter duty does not fall within RCW 4.16.300.[3]
The superior court correctly held that the six-year statute of repose did not apply to Mr. Meneely's action against NSPI.
2. Duty of Care.
NSPI assigns error to the superior court's determination, as a matter of law, that it owed Mr. Meneely a duty to exercise reasonable care when it formulated and promulgated its safety standards. NSPI argues that the voluntary rescue doctrine does not support the superior court's holding.
Whether a duty exists is a question of law. Hartley v. State, 103 Wash.2d 768, 778-79, 698 P.2d 77 (1985). Here, the court held that "NSPI owed [Mr. Meneely] a continuing duty, based upon Washington common law [Brown v. MacPherson's, Inc., 86 Wash.2d 293, 545 P.2d 13 (1975)] ..., to exercise reasonable care in the development, formulation and dissemination of its residential swimming pool standards[.]" Further, NSPI owed consumers such as Mr. Meneely a duty of care "in the development, formation and dissemination of instructions and warnings with respect to the safe use of its member[s'] residential pool and diving board products[.]" Accordingly, it denied NSPI's motion for summary dismissal of Mr. Meneely's negligence claim.
The voluntary rescue doctrine is a well established liability concept. In Brown, 86 Wash.2d at 299, 545 P.2d 13, the court recognized that in certain circumstances, a person may be liable in negligence if he or she gratuitously assumes a duty to act on behalf of another and fails to act with due care in performing that duty. The plaintiffs there had sued the State, alleging that an employee of the real estate division of the Washington Department of Motor Vehicles assumed such a duty. The employee had been approached by a noted avalanche expert who informed him that the plaintiffs' cabins were in a high risk avalanche area. The employee led the expert to believe he would convey the warning to the plaintiffs. Instead, the employee met with the plaintiffs' real estate broker and indicated no danger existed.
The court in Brown held at page 299, 545 P.2d 13 that the plaintiffs' allegations stated a possible cause of action for misfeasance; i.e., "the State's agents undertook to prevent the avalanche damage by conferring with [the real estate broker], in effect to rescue [the plaintiffs] from their danger, but in the process ... negligently misled [the broker] and thus made [the plaintiffs'] situation worse." The court relied upon prior Washington case law for the proposition that "[o]ne who undertakes, albeit gratuitously, to render aid to or warn a person in danger is required by our law to exercise reasonable care in his efforts, however commendable." Id. And, if the rescuer does not exercise reasonable care and thereby increases the risk of harm to the other person, he is liable for damages.
The court in Brown also held that under the facts alleged by the plaintiffs, the State could be held liable for nonfeasance; i.e., the representation of the State employee to the avalanche expert that he would take care of the matter caused the expert to refrain from warning the plaintiffs himself. In other words, the State assumed a duty to warn, *56 upon which the expert relied, then did not perform the duty.
One of the prior Washington cases Brown relied upon is Sheridan v. Aetna Cas. & Sur. Co., 3 Wash.2d 423, 100 P.2d 1024 (1940). There, an employee of a tenant in the Stirrat building in Seattle fell down the shaft of the building's freight elevator. The elevator's doors had failed to close after the car left the floor and before the plaintiff arrived. The plaintiff fell when he stepped into the shaft, believing the car was there. He sued and named as a defendant the insurance company that had agreed under the terms of the owner's policy to inspect the building's elevators on a periodic basis and file with the city a copy of the report. A city ordinance made it unlawful for the owner of any freight or passenger elevator to maintain or operate the same without regular safety inspections. The ordinance also required the safety inspector to file a report with the city. The court concluded that the insurer was liable to the plaintiff in negligence "because of the legal responsibility attaching to its voluntary assumption, as the owner's agent, of the duty of proper inspection and reporting to the city." Id. at 439, 100 P.2d 1024.
In Folsom v. Burger King, 135 Wash.2d 658, 958 P.2d 301 (1998), the plaintiffs also sought, this time unsuccessfully, to impose liability on a defendant under the voluntary rescue doctrine. There, the plaintiffs' decedents, employees of a fast food restaurant, were murdered during a robbery. At some point during the robbery, one of the decedents had activated the defendant's security system alarm. The defendant did not answer the alarm because the restaurant owner had discontinued the service about one year earlier. The plaintiffs argued that the employees reasonably believed that the defendant's security system continued to offer protection because the defendant had not removed the system from the restaurant. Therefore, the company was liable for damages for their deaths.
The court held that the plaintiffs in Folsom had not established that the voluntary rescue doctrine applied in that case. The court stated that "[t]he duty to rescue [or to warn] arises when a [defendant] knows a danger is present and takes steps to aid an individual in need." Id. at 677, 958 P.2d 301. "Typically, liability for attempting a voluntary rescue has been found when the defendant makes the plaintiff's situation worse by: (1) increasing the danger; (2) misleading the plaintiff into believing the danger had been removed; or (3) depriving the plaintiff of the possibility of help from other sources." Id. at 676, 958 P.2d 301 (citing W. PAGE KEETON ET. AL, PROSSER AND KEETON ON THE LAW OF TORTS § 56 (5th ed.1984)). The court concluded the security company was not liable because the company's failure to remove the security system did not create an ongoing duty to rescue the employees from unknown dangers, and the company's inaction did not create the danger to the employees.
In arguing the voluntary rescue doctrine imposes liability on NSPI in his case, Mr. Meneely relies upon several facts, including that NSPI publishes the swimming pool and equipment industry's only comprehensive set of safety standards. The standards cover all aspects of swimming pools and pool equipment. The Council of American Building Officials and the International Conference of Building Officials have adopted some or all of the NSPI standards, and the International Residential Code and Southern Building Code have incorporated some or all of those standards into their codifications.
Also, in reviewing its standards for diving boards, NSPI undertook testing, the results of which indicated a risk of severe injury to persons like Mr. Meneely who used the boards. NSPI nevertheless decided to retain the existing pool and board combinations and initiated the "steer up" program to address the risk. It instructed its members to refer to the standards in their product literature and to mark instructions and packaging suitably as to pool type "[f]or [their] own protection." NSPI also instructed its members to affix conspicuous labels to their products, warning that diving equipment, if installed, must meet NSPI standards for the type of pool.
NSPI members relied on the standards. As set forth earlier, Mr. Dowd stated that in his experience everyone in the pool industry conformed to the standards. Jacuzzi, Inc., *57 included NSPI's depth standard as part of its catalog for diving boards. S.R. Smith printed reference to the standard on the diving board in this case. The label read, "TO BE INSTALLED ON POOL WITH 7½ FT. DEPTH OR GREATER (TYPE II POOL) Per, N.S.P.I. Specifications Section 211-Jan. 1, 1972." Plastimayd Corporation, the company that manufactured Mr. Williamson's replacement liner, included a copy of the standard with its product. Both the presidents of S.R. Smith and of Plastimayd testified their companies relied upon NSPI standards. NSPI members who elected to derate their board from Type II pools would have been at a competitive disadvantage. Members followed the standard out of economic imperative.
We hold the foregoing facts fall squarely within the voluntary rescue doctrine. By promulgating industry wide safety standards that pool and board manufacturers relied upon, NSPI voluntarily assumed the duty to warn Mr. Meneely and other divers of the risk posed by this type of board on a Type II pool. It failed to exercise reasonable care in performing that duty, when it did not change the standard after it knew that studies showed the pool and board combination was dangerous for certain divers.
NSPI's attempt to distinguish Brown is not persuasive. It argues that the harm here was not imminent and that its connection with the consumer was too attenuated to impose liability. We disagree with NSPI. The evidence at trial showed that any diver of Mr. Meneely's approximate age, height, weight, and athletic build was at risk using this board and pool combination. And, the connection between NSPI and Mr. Meneely was no more attenuated than in Sheridan, which Brown relied upon in its holding. There, the insurer was held to owe a duty of care to the elevator user when it assumed the responsibility of inspecting the elevator for its owner. NSPI likewise owed Mr. Meneely a duty of care when it assumed the responsibilities of the manufacturers and retailers of the pool and board, for setting pool safety standards.
Folsom is distinguishable, based in part upon the foreseeability of the harm. "`The ultimate test of a duty to use [due] care is found in the foreseeability that harm may result if care is not exercised.'" King v. National Spa & Pool Inst., Inc., 570 So.2d 612, 615, 1 A.L.R. 5th 1109 (Ala.1990) (quoting Bush v. Alabama Power Co., 457 So.2d 350, 353 (Ala.1984)). "`"Without evidence that a defendant knew or reasonably should have known there was any danger or potential danger associated with that defendant's act or failure to act, any imposition of liability would in essence be the imposition of liability without fault."'" N.N.V. v. American Ass'n of Blood Banks, 75 Cal.App.4th 1358, 1376, 89 Cal.Rptr.2d 885 (1999) (quoting Ludwig v. City of San Diego, 65 Cal.App.4th 1105, 1111, 76 Cal.Rptr.2d 809 (1998)). The risk in Folsom that the employees would die as a result of the security company's failure to remove its system was not foreseeable. Here, NSPI was on notice that its standards created a grave risk of harm.
In so holding, we are cognizant that no Washington court has previously addressed the precise issue of whether a trade association owes a duty of care to the ultimate consumer when it formulates safety standards for an industry. Other jurisdictions have come down on both sides of that issue, and, more often than not, foreseeability of the harm is the pivot point for the courts' decisions. Two such cases involved NSPI as the defendant. In Meyers v. Donnatacci, 220 N.J.Super. 73, 531 A.2d 398 (1987), the plaintiff dove into the shallow end of a pool and was injured. He sued NSPI on the theory that it held itself out as the expert on pool safety standards, that it was foreseeable that persons would be injured if NSPI did not use reasonable care in carrying out its operations, and, therefore, NSPI owed him a duty of care. Meyers, 531 A.2d at 402. The court disagreed, finding that NSPI had not undertaken the duty to warn consumers of the danger of shallow water diving. Specifically, "[t]here was nothing that NSPI did or failed to do which increased the risk to the Plaintiff. There is no evidence that NSPI recommended any changes, suppressed any information, or failed to recommend any changes which in any way increased the risk to the Plaintiff. The hazard of shallow-water *58 diving existed independently of any acts on the part of NSPI." Id. at 406.
Meyers is clearly distinguishable from Mr. Meneely's case. Here, NSPI has promulgated specific safety standards relating to diving boards. And, it failed to change the standard after it knew of the risk. Mr. Meneely's situation is comparable to that in King, 570 So.2d 612. There, the plaintiff's intestate, like Mr. Meneely, broke his neck when he dove into a pool from a board prescribed for a pool of its dimensions. The court observed that "[i]t is well settled under Alabama law that one who undertakes to perform a duty [that it] is not otherwise required to perform is thereafter charged with the duty of acting with due care." Id. at 614. Citing the rule that the ultimate test of duty is the foreseeability that harm might result if due care is not exercised, the court held NSPI was under a legal duty to exercise due care in promulgating the standards. NSPI's voluntary undertaking to promulgate minimum safety design standards "made it foreseeable that harm might result to the consumer if it did not exercise due care." Id. at 616.
We therefore conclude that the superior court properly held, as a matter of law, that NSPI owed Mr. Meneely a duty of due care.[4]
3. Proximate Cause.
NSPI next contends that the evidence and the reasonable inferences therefrom do not support the jury's finding that the proximate cause of Mr. Meneely's injuries was NSPI's negligence in promulgating its safety standards and in failing to warn pool owners when it became aware of the risk.
Proximate cause has two distinct elements: cause in fact and legal causation. Schooley v. Pinch's Deli Market, Inc., 134 Wash.2d 468, 478, 951 P.2d 749 (1998). Cause in fact is based on the physical connection between an act and an injury; i.e., whether the defendant's act was the actual or "but for" cause of the plaintiff's injury. That determination is generally left to the jury. Id. In contrast, "legal cause is grounded in policy determinations as to how far the consequences of a defendant's acts should extend." Id. "The focus in the legal causation analysis is whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability." Id. at 478-79, 951 P.2d 749. "A determination of legal liability will depend upon `"mixed considerations of logic, common sense, justice, policy, and precedent."'" Id. at 479, 951 P.2d 749 (quoting King v. City of Seattle, 84 Wash.2d 239, 250, 525 P.2d 228 (1974)). Issues of duty and legal causation are intertwined. Schooley, 134 Wash.2d at 479, 951 P.2d 749. "However, a court should not conclude that the existence of a duty automatically satisfies the requirement of legal causation." Id. "Legal causation is ... a concept that permits a court for sound policy reasons to limit liability where duty and foreseeability concepts alone indicate liability can arise." Id.
The jury here considered the following evidence on the issue of causation: Jordan Votja, the contractor who subcontracted the excavation work in Mr. Williamson's yard for the pool in 1965, did not rely upon NSPI specifications. Rather, the excavation was the same size as those he had provided for other "hopper bottom" pool installations. The original vinyl pool liner and the replacement liner that was manufactured by Plastimayd and installed in 1981, fit the excavation, although it was of slightly different dimensions *59 than the dimensions specified in NSPI's safety standards for Type II pools. Mr. Dowd, a former NSPI executive, testified that, to the best of his knowledge, all manufactured pools with vinyl liners were made consistent with NSPI standards for Type II pools. Experts retained by Mr. Meneely testified that Mr. Williamson's pool was, for all practical purposes, the same as an NSPI Type II pool.
Don Jones of Pool and Patio Supply sold Mr. Williamson the S.R. Smith 606 jump board in 1974 to replace his existing board. His employees installed the new board on Mr. Williamson's pool. Mr. Jones testified he did not measure Mr. Williamson's pool because he replaced the existing board with one of a like kind. Mr. Jones was a member of NSPI. When Mr. Williamson purchased the new board, NSPI already had commissioned and received the results of the Stone Report that stated that the slowing effect of the water was insufficient to keep a diver from impacting the pool bottom of an NSPI Type II pool.
The court also admitted a letter written in October 1982 by Dr. Robert Weiner, a consulting engineer, to NSPI Vice-President Larry Paulick. Dr. Weiner recommended that jump boards be banned from Type II pools. NSPI did not do so. At about this same time, it issued a "NSPI Consumer Awareness Bulletin," which addressed consumer questions about pool safety, including the safety of diving boards. The bulletin included the following:
Q Why not ban all diving boards?
A Statistics show that fewer than 5% of the diving accidents occur in the deep or diving end. Even without a diving board, a person can achieve the same water impact and velocity from a running dive off the side of the pool.
Q What if pools with diving boards were deeper and/or longer, wouldn't they be safe?
A Critics who say deeper and/or longer is safe are doing the consumers an injustice by leading them into a false sense of security.
 Industry studies indicate that it takes in excess of 22 feet before the body slows down sufficiently to prevent serious spinal cord injury.
 Exact measurements of length and depth are not as important as being aware of the proper way to dive.
. . . .
Q Should depth warnings be mandated on residential pools?
A No. It's unlikely that depth warnings would have a significant effect on injuries, because statistical information has shown that the residential pool diving victim was familiar with the pool and had been using it prior to the accident.
. . . .
Q What is the industry doing to address diving safety?
A The industry has supported studies over the last eight years to provide solutions that would reduce the number of diving accidents. On the basis of these studies a diver training program has been instituted.
Q Has the industry considered safety solutions such as removing the diving board, soft bottoms, non-slip bottoms, deeper pools?
A All of these solutions, and many more, have been considered. Invariably for every suggested solution to a specific problem, a new hazard has been discovered or the suggestion has been proved to be ineffective.
For example: Soft bottoms can trap the diver's head like a catcher's mitt, promoting an accident where one may not have occurred.
Q Does the industry have a good solution for diving accidents?
A Independent research has shown that proper training is the solution for reducing these relatively few but serious accidents.
The foregoing evidence presented disputed issues of fact as to causation, which the jury decided in Mr. Meneely's favor. Mr. Williamson's pool varied slightly from the NSPI standards in depth, distance to the top of the transition slope, and in the ratio of the slope's rise. But, Mr. Meneely's experts testified that it was "substantially" the same as *60 a Type II pool, particularly at the point on the transition slope where Mr. Meneely hit headfirst. Other evidence presented by Mr. Meneely showed that NSPI did nothing to warn consumers of the risk, even though national lists of pool owners were available.
We hold the evidence and the reasonable inferences therefrom support the jury's findings that NSPI negligently caused Mr. Meneely's injuries when it (1) formulated a safety standard that permitted this type of board on a Type II pool, and (2) did not warn consumers when its research revealed the risk in the early 1970s. See Hojem v. Kelly, 93 Wash.2d 143, 145, 606 P.2d 275 (1980).
NSPI also argues that Mr. Meneely's injuries are too remote from NSPI's acts to establish liability on its part. The argument appears to raise a question of legal causation, but NSPI does not detail why justice, common sense, and policy, see Schooley, 134 Wash.2d at 479, 951 P.2d 749, would call for a determination that it is not the legal cause of Mr. Meneely's injuries. NSPI does point out that it had no input in the size, placement, or design of the sticker S.R. Smith placed on its diving board to advise the consumer that it was appropriate for a pool seven and one-half feet deep per NSPI 1972 specifications. But, since the label accurately represented NSPI's safety standard, this fact does not aid NSPI.
Affirmed.[5]
The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.
KURTZ, C.J., and BROWN, J., concur.
NOTES
[1] NSPI's 1961, 1972, 1974, 1978, and 1987 standards varied slightly in the minimum, recommended dimensions for a Type II pool.
[2] For every three feet of its length, the depth of the transition slope decreased by one foot.
[3] This court notes that NSPI's reliance upon McCulloch v. Fox & Jacobs, Inc., 696 S.W.2d 918 (Tex.Ct.App.1985) for the proposition that the statute of repose bars claims for failure to warn, is misplaced. There, the plaintiff sued a developer for damages resulting from injuries he sustained when he dove into the unmarked shallow end of a community pool. He incurred the injuries more than a dozen years after the pool was built. The court held that the developer, "with respect to building the pool, ... functioned not as an owner but as a builder or supervisor" and, therefore, was protected by the statute of repose. Id. at 922. The court's holding was not based upon the fact the alleged defect was a failure to warn of the danger.
[4] The superior court held, in the alternative, that NSPI owed Mr. Meneely a duty of care under Restatement (Second) of Torts § 324A (1965). That section has not yet been adopted by a Washington court. It provides, as follows:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
(a) his failure to exercise reasonable care increases the risk of such harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
Since the superior court's holding is sustainable under Washington law, as set forth in Brown, we do not address this issue.
[5] The National Electrical Manufacturers Association, the American Society of Association Executives, and the Washington State Trial Lawyers Association Foundation filed amici curiae briefs in this appeal. The Electrical Manufacturers and the Association Executives express concern that the imposition of tort liability would chill important trade association research and development activities, "thereby having the net effect of decreasing product safety overall." We recognize their concern, but we also point out that the narrow holding here need not have that effect. Specifically, NSPI did not change its safety standard after the Stone Report, which NSPI itself commissioned, indicated the diving board was unsafe for use in Type II pools. NSPI should have known that the pool and board combination was unsafe, yet it did nothing to warn consumers of the risk. The forseeability of the risk of harm distinguishes this case.